## Case No. 15,304.

### UNITED STATES v. HARE.

[Brunner, Col. Cas. 449;[1] 2 Wheeler, Cr. Cas. 283.]

Circuit Court. D. Maryland. May, 1818.

CRIMINAL LAW — COMMON-LAW JURISDICTION OF FEDERAL COURTS—STANDING MUTE IN CAPITAL CASES—ROBBERY OF THE MAIL.

1. The courts of the United States have not common-law jurisdiction in criminal cases: they will not punish an offense at common law unless punishable by statute.

---

1 [Reported by Albert Brunner, Esq., and here reprinted by permission.]

2. On arraignment for a capital offense, if the person charged stand mute, the trial will proceed as though he had pleaded not guilty.

[Approved in U. S. v. Borger, 7 Fed. 195.]

3. The first offense of robbing the mail is a capital crime, if the robbery be effected by the use of dangerous weapons, thus putting in jeopardy the life of the person having the custody of such mails.

[4. Cited in Ball v. U. S., 140 U. S. 118, 11 Sup. Ct. 761, to the point that in cases not capital the prisoner is not entitled to a copy of the indictment at government expense.]

Joseph Thompson Hare, Lewis Hare and James Alexander were indicted under the second clause of the nineteenth section of the act of April 30, 1810, which is in the following words: "Or, if in effecting such robbery of the mail the first time the offender shall wound the person having custody thereof, or put his life in jeopardy, by the use of dangerous weapons." It appeared that between 10 and 11 o'clock p. m., on the 11th of March, 1818, the great southern mail was stopped and robbed by the prisoners. They built a fence across the road, within two miles of Havre de Grace, and when the mail came up they sprang from behind the fence and presented pistols, which were cocked, and said: "Here we are, three of us, highway robbers, armed with double-barrel pistols and dirks," and threatened to blow the driver's brains out if he made any resistance. They tied the driver and Mr. Ludlow, a passenger, and proceeded to plunder the mail. The driver and Mr. Ludlow both testified they considered his (the driver's) life in danger if he had made any resistance. The robbers were subsequently arrested and tried before the circuit court of the United States, Baltimore, May, 1818. One count in the indictment charged them under the above clause of robbing the mail by putting the life of the driver in jeopardy. The other counts were for a simple robbery of the mail.

William Wirt, U. S. Atty. Gen., Elias Glenn, U. S. Dist. Atty., Thomas Kell, and Reverdy Johnson, for prosecution.

Gen. William Winder, David Hoffman, Charles Mitchell, Upton S. Heath, and Eben. L. Finley, for prisoners.

2 [The grand jury having returned bills of indictment against the prisoners, John Alexander, and Lewis Hare, they were brought before the court for arraignment. Upon the arraignment of Joseph Thompson Hare, he pleaded not guilty. The indictment against Lewis Hare was then read to him, when Mr. Mitchell, on the part of the prisoner, observed, that the counsel were not prepared to plead, nor to advise what plea was proper to be entered. The court decided that as the prisoner had been arraigned, he must plead instanter; and observed that his plea should not be considered with any prejudice to his rights, and might be withdrawn the next day if the counsel thought proper. A

---

2 [From 2 Wheeler, Cr. Cas. 283.]

plea to the jurisdiction, and a plea of not guilty were then tendered. John Alexander was then arraigned, and the same plea tendered.

[Tuesday, May 5th.—The prisoners were brought before the court. Their counsel asked leave to withdraw their pleas, stating they had not considered what course would be most beneficial for the accused. Mr. Kell, on the part of government, objected, unless the counsel for the prisoners would state what was their object in withdrawing the pleas. The counsel replied that they had entered them upon an unconditional promise of the court that the pleas might be withdrawn if the counsel for the prisoner thought proper. To this Judge Houston assented; and by order of the court the pleas were in each case withdrawn. The prisoners were then severally placed in the bar, and were informed by the court that they had allowed their pleas to be withdrawn, and that they were now to plead anew. The indictments were then read in each case, and the prisoners were severally arraigned, and upon being asked whether they were guilty or not guilty, they stood mute and refused to answer. The counsel for the prisoners informed the court that they had instructed them to stand mute. The district attorney then stated that the court might proceed in the same manner as if they had pleaded not guilty, either under the 30th section of the act of congress of 1790 [1 Stat. 112], entitled "An act for the punishment of certain crimes against the United States," or that the court might proceed against them as at common law. The court, however, took time till the next day, to make up their opinion on the proper course of proceeding.

[Wednesday, May 6th.—The court met, and, the counsel for the prosecution and the counsel for the prisoner appearing, the court heard an argument on the proper course of proceeding in the trials of the prisoners.

[Reverdy Johnson, Esq., on the part of the prosecution, addressed the court to the following effect: The court are now called on to decide a question, which, I believe, has never before presented itself to any of the courts of the United States. That is, whether this court has the power to proceed to the trial of the persons indicted of robbing the mail of the United States, notwithstanding their refusing to plead, or, in technical language, their standing mute? As one of the counsel for the prosecution, it becomes my duty to show the court they have such power. If this offence was especially contained in the act of congress of 1790 (chapter 9), then there could be no doubt as to the course which the court on this occasion ought to adopt, because it would be expressly provided for by the 30th section of that law. It will, however, no doubt, be contended by the counsel for the accused, that inasmuch as the offence for which their clients are indicted was not created by the act of congress

of 1790, but by that of 1810, for the regulation of the post office, that, therefore, the provisions of the 30th section of the former law, for incidents like the present, in the trial of offences, only embraces offences created by that law, and does not extend to those of a subsequent origin; or, in other words, that that provision cannot be construed to apply to offences which did not exist at the time such provision was made. I will, however, endeavour to convince the court that by a fair and liberal construction of the act of congress of 1790, the case before the court is included in the provision in question. By the 29th section of that law, after directing that every person accused of treason shall have a copy of his indictment, and a list of the jury, &c., three days before he shall be tried for the same; and it is further directed, "that in other capital offences, he shall have such copy of the indictment, &c. two days before his trial." That section further provides for persons so accused many other rights and privileges. Then comes the 30th section, and so far as is necessary for the consideration of the question before the court, it is in those words: "If any person be indicted of treason against the United States, and shall stand mute, &c. or if any person be indicted of any other of the offences herein before set forth, for which the punishment is declared to be death, if he shall stand mute, &c. the court in any of the cases aforesaid, shall, notwithstanding, proceed to the trial of such person so standing mute, &c. as if he or they had pleaded not guilty, and render judgment thereon accordingly." The court will perceive that the offences in both these sections of the law are enumerated in the same order, and that the only variance in their language is that the words "other capital offences" are used in the second sentence of the 29th section, and the words "offences herein before set forth" in that of the 30th section. From this similarity, therefore, it would seem to follow that the provisions of both sections should receive the same construction; and, since no one can doubt but that the persons now indicted are entitled to copies of the indictments, and to all the other privileges given by the 29th section, so also, it seems to me impossible that any one can conceive that the power of the court to proceed to trial, when the party stands mute, as provided by the 30th section, does not also extend to the case now before the court. Again, the words "herein before set forth," contained in the 30th section, which the counsel on the other side will contend prevents the provisions of that section from applying to the case before the court, can, as I apprehend, receive no other sensible construction than that which will extend it, not only to offences specially described in the preceding part of the law, but to every offence previously mentioned; and since the general words, "other capital offences," in

the immediate preceding section of the law, it is admitted on all hands embraces every offence against the laws of the United States, and, therefore, the offence now to be tried, it follows, that the provisions of the 30th section extend also to this case. As another reason for giving liberal construction to the words "herein before set forth," I would remark to the court, that the provisions of the 30th section did not infringe any right which persons in such situations previously enjoyed, but, on the contrary, gave them an additional privilege. To show the court that I am correct in this opinion, I refer them to the 11th section of the act of congress of 1789 (chapter 20), by which exclusive jurisdiction of all crimes and offences cognizable under the authority of the United States is given to the circuit courts of the United States, except where it is otherwise directed; and to the 34th section of the same law, where it is provided that the laws of the several states, except when otherwise directed, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases where they apply. If then the provisions of the 30th section of the act of congress of 1790 should be construed by reason of the words "herein before set forth," to extend only to the offences created by that act, it follows, that in the trial of all other offences, where the persons accused stood mute, the court would be obliged to proceed as the laws of the state, in which the trial happened, in like cases directed. What then, previous to the act of assembly of Maryland of 1809 (chapter 138), by which, in all cases of treason or felony, where the party stands mute, a similar provision is made to that of the 30th section of the act of congress of 1790, was the law in such cases in this state? I state it to have been, and I do so without fear of contradiction, that a standing mute amounted to a confession of the charge, and that judgment would have been rendered thereon as on the finding of the verdict. In order to satisfy the court that such was the law, I refer them to Kilty's Report of English Statutes, p. 17, where in a note on the statute of Westminster (3 Edw. I. c. 12) two cases are cited in which such a judgment was awarded, and to the statute of 12 Geo. III. c. 20, which directed such judgment in all cases of felony to be entered, which statute extended to this state by express provision, as the court will find by the same report of statutes (page 199). I think that I have now satisfactorily shown the court that I was right in saying that the 30th section of the act of congress of 1790 did not restrain, but enlarged, the privileges of persons accused of offences against the laws of the United States. If, however, the court should be of opinion that I am wrong in giving this liberal construction to the act of 1790, and that the provision of the 30th section of that law cannot be made to apply to the case before the court, I think

there is another ground, on which the court may safely proceed to the trial of these persons, and it is shortly this: By the 34th section of the act of congress of 1789 (chapter 20), which I have before had occasion to refer to, it is directed "that the laws of the several states, except where the constitution creates or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States, in cases where they apply." I imagine it will hardly be contended that this provision was intended to be confined to such laws of the states as were in existence at the time that act of congress was passed. There is nothing in the language of the provision which justifies such a restricted construction. The words are general, that the laws of the several states, &c. shall be rules of decision in the courts of the United States, except where it is otherwise directed. What then is the law in this state, on a case like the present? By the act of assembly of 1809, c. 138, § 12, which I have also before incidentally noticed, it is provided "that if any person be indicted of treason or felony, and he or she shall stand mute, or will not answer to the indictment, the court in such case shall notwithstanding proceed to the trial of such person so standing mute, as if he or she had pleaded not guilty, and render judgment thereon accordingly." If therefore, the court should be of opinion—which I am far from anticipating—that they have no authority to go on with the trial of those persons, under the 30th section of the act of congress of 1790, I imagine they then cannot doubt but that they have such power under the act of assembly of this state, when taken in connection with the 34th section of the act of congress of 1789 [1 Stat. 92]. Because, if "there be nothing in the constitution, treaties, or statutes of the United States, which otherwise provides," that act of assembly must be regarded as a rule of decision by the courts of the United States, and this court is bound by it under the 84th section of the act of congress of 1789; and as no such provision can be found, this court has full and complete authority, nay, they are compelled, to proceed according to that act of assembly, and that is, to go on to try those persons as if they had pleaded not guilty. Here I think I might safely rest this question. There are, however, some other remarks which, with the permission of the court, I will now suggest. If the acts of congress of 1789 and 1790 had never passed, I feel but little hesitation in saying that you would notwithstanding have no difficulty in proceeding with this trial; because, as the trial by jury for offences of this kind is directed in general words, by the constitution of the United States, it would follow that all the incidents to that mode of trial, in the absence of particular provisions on the subject, would be considered as also directed. In the whole

history, then, of jury trial, previous to the time of Edward I., I defy the counsel for the accused to point out a single instance where a person escaped a trial by standing mute. If this mode of trial was ever at any stage of its existence, so defective as to suffer such an escape, it is obvious that they would always have been effected, and that the trial itself would have been only a mockery of justice. The gentlemen may possibly say that the party might have escaped a trial by standing mute; he could not have escaped with impunity, as he would have been subject to the dreadful punishment of "peine forte et dure." I deny, however, that such a punishment ever existed at common law. We are to look for its origin to the statute of Westminster (3 Edw. I. c. 12). By the common law, standing mute was, in all cases, as it is now by the statute of 12 Geo. III., a confession of guilt. To prove this, I refer the court to 4 Bl. Comm. 327. In the United States, however, it is very certain that the punishment of "peine forte et dure" never existed. In the absence then of all statutory provisions, the court would be justified in considering those persons as confessing their guilt, and in according judgment against them accordingly. There is, however, another reason, which to my mind, shows conclusively that you must have the power to proceed with this trial, and it is, that if you have not that authority, those persons must escape unpunished, since the state courts, in cases like the present, do not possess concurrent jurisdiction, because they have not the power of punishing to as great an extent as the act of congress prescribes for the punishment of those persons if they should be convicted. The courts of the states have only jurisdiction over the prosecution of such offences against the act of 1810, under which the persons now before the court are indicted, as by the laws of the state they can punish to as great an extent as that act directs. If then the counsel for the accused are right, robberies of the mail of the United States may be effected with almost perfect safety, since, if detected, the robbers may escape being tried by adopting the plan of the persons now charged with that offence; or in other words, if they will only stand mute when arraigned, they may securely bid defiance to the laws of the land, and render the act of 1810, so far as it regards the offences of robbing the mail, a dead letter. I believe I have now put the court in possession of all the observations that have occurred to me on this question. I feel confident that much more might be said than I have been able to suggest. I shall be followed however by gentlemen who will add everything which the question admits of. I feel sorry that I should have suffered myself to have trespassed so long on the patience of the court. I return the court thanks for the kindness with which they have listened to me, and I conclude with a full assurance that this trial will go on as if the prisoners had pleaded not guilty.

[Elias Glenn, Dist. Atty., for prosecution. —The question now under consideration presents more of novelty than of difficulty. The learning respecting standing mute has been long considered rather as a subject for the curious student, than of essential importance to the practical lawyer. To-day, for the first time since the adoption of our present form of government, we have to inquire a little into its nature, and to ascertain whether the voluntary act of a criminal can obstruct the progress of justice, and put at defiance laws the most salutary and necessary for society. According to my understanding of the case, this is its situation: Upon their arraignment in the first instance, the prisoners pleaded not guilty. Their counsel, after some advisement, thought proper to request of the court that this plea might be withdrawn, in order, according to my impression, that the prisoners might plead de novo, for if such an understanding had not existed with the court, would they for one moment have permitted any alteration to have been made in a plea which gave to the prisoners every fair and proper advantage that a prisoner ought to possess? If such impression were correct, and the court knew, as is the fact, that the visitation of God has not silenced the prisoners, would it not be proper for the court to insist on some plea being filed in the cause? But waiving, for argument's sake, this consideration, let us enquire in what predicament the court is now placed,—whether the trial must stop at this place, and the infliction of the punishment provided by law for offences of the high character charged in this indictment is to be prevented by this course of proceeding. I shall contend on this point —1st. That this conduct of the prisoners is a constructive confession, and the court must proceed to pass sentence upon them. Or 2d. That the court may proceed to the trial, as if the general issue plea of not guilty had been interposed.

[1st. The counsel for the prisoners contend that this is a casus omissus in the law, and there being no common law by which the courts of the United States can be governed in criminal cases, we must stop here. If the prosecution is to derive no benefit from the common law, the prisoners must be upon the same footing in this respect. They are to have no benefit of it either, and our common sense is called in to govern in the decision of this case, and what would that say? That the prisoners were guilty; that their silence is a constructive confession. In pleading (which is justly said to be a system of sound reasoning), not denying an allegation is an admission of it. If a defendant in a civil suit say nothing, judgment is rendered against him. If a charge be made against a man in his presence, and in his hearing, and he does not deny it, this

might be given as evidence to prove the fact thus charged upon him. Now, if the very facts laid in this indictment had been charged upon the prisoners in any other place than a court of justice, and they had pursued the same line of conduct which they have now adopted, such conduct would have served as testimony to have produced a conviction for this very crime. For whose benefit was the provision of the act of April 30th, 1790,—for the benefit of the prosecution or of the prisoner? Unquestionably for the benefit of the prisoner. He is, by his obstinacy, amenable in a degree to the court: but our laws (wishing to give a criminal every possible advantage of a fair and impartial trial) have considered him as guilty of no offence in the particular cases therein mentioned. Then if the provisions of that act do not reach this case, the prisoners are not even entitled to the lenient and merciful provisions of that law.

[On the second point Mr. Glenn contended that, as an incident to the power and authority of the court, they had a right to try these men. The prisoners have divers privileges for their own benefit. They may plead not guilty, they may have counsel, they may have witnesses, they may challenge jurors, they are entitled to a copy of indictments, and a list of the witnesses. But if they decline the enjoyment of their rights, is the progress of justice to be arrested? If they will not receive a copy of their indictments, are they never to be tried? If they will not enjoy the benefit of counsel, is the court obliged to wait until their better judgment shall induce them so to do? If they will not challenge jurors, must the court pause until they think fit to challenge them? These are all privileges granted to the prisoners. They may accept or refuse them at their pleasure: but such refusal shall never operate to retard the march of justice in its course. In England, a speedy disposition of these causes would have been made by the common law. This conduct of the prisoners is a constructive confession. Staunf. P. C. 149; 2 Hawk. P. C. c. 30, § 13; 2 Hale, Com. Law, 317, 322; 4 Bl. Comm. 324, 329). Now if the court cannot proceed with these trials, the monstrous absurdity follows that a criminal by a shift, a trick, may forever evade the provisions of a penal law,—a proposition, the statement of which carries with it its own refutation. This court must frequently proceed according to the directions of the common law. They can fine jurymen and witnesses for non-attendance; nay, if a bystander had advised the prisoners at the bar to stand mute, would the court not have punished him for such conduct? In England they certainly would. 4 Bl. Comm. 126. It would be arresting the progress of justice, and I think the court would be fully authorized to impose a penalty similar to that inflicted in England.

[But we consider this case as coming reasonably within the provisions of the act of 30th April, 1798, or to be governed by the rules of the laws of the state of Maryland. See Act Cong. Sept. 24, 1789; 1 Laws [Folwell's Ed.] p. 47 [1 Stat. 73]; and Laws Md. 1809, c. 138. We are willing to allow to the prisoners every advantage which they could derive under a plea of not guilty, and not even by their own improper conduct to injure their cause.

[Charles Mitchell, Esq.—The court will find on examination, that this is not one of the cases of standing mute mentioned in the act of congress, where they are to proceed as if the prisoners had pleaded not guilty. Those cases are specifically enumerated in the act of 1790, and this power is limited to the cases there specified. Robbery of the mail is not one of them. You must proceed then according to the law and practice of this state at the date of the judiciary system. At that period the common law practice prevailed here; but the statute of Westminster I., and the subsequent English statutes to 12 Geo. III., providing for such cases, were never extended to this state. It was by statute alone that the English courts were enabled to punish him who stood mute as if he had pleaded guilty. At common law there was no such power. The utmost extent of common law punishment was severe imprisonment until he pleaded. Even the peine dure et forte was a statute punishment. If the prisoners stand obstinately mute, therefore, it is a casus omissus. You have no power to try them, or to inflict capital punishment. But if an inquest is awarded to inquire how they stand mute, it will be ascertained that they do not stand obstinately mute, but have merely exerted a legal right to refuse to plead because their arraignment was irregular and against the law of the land. I do not intend, however, to enter into the discussion here. It was no part of my object in rising to address the court. I have merely said this much to satisfy the court that, whether our conclusions are well or ill-founded, we have some plausible reasons at least for the course we have adopted, and have not been impelled by a wanton desire to embarrass the court without any prospect of advantage to our clients. We had indeed indulged the hope that the court knew us too well to render such an assurance or explanation necessary; but the unusual, unexpected, and extraordinary appeal from the district attorney has extorted these remarks where we should otherwise have been silent. The gentleman has charged us with obstructing the course of justice, and vehemently asks if such conduct is to be tolerated here, which in the courts of Great Britain would subject us to fine and imprisonment. Sir, I deny the law to be so in England as he stated it, and whenever he feels disposed to enter into that question, shall be ready to

meet him. But if it were so there, I desire to bless God and those who purchased our inestimable privileges with their blood, that our situation in this court is not so humble and degraded. Has the gentleman forgotten, sir, that while in England the accused is denied the aid of counsel altogether, except on questions of law, and then receives it as pure bounty from the court, here he has a legal—nay, a constitutional—right to be heard and advised by counsel in every stage of the proceedings against him; that while in the criminal courts of England the counsel for the prisoner is the mere creature, the automaton, the very serf of the court, holding his place by a base and servile tenure, here he is an independent officer of the constitution, standing erect and firm on his constitutional freehold, and accountable to God and his conscience alone for whatever advice he may give his client. Execrated let him be, and forever abhorred by his professional brethren, who shall meanly shrink from the sacred duties he has to perform, or tamely suffer the interposition of any judge or court between him and his client. Sir, we have deemed it a legal right of the prisoners to refuse to plead; we have thought it might be beneficial to them: and with these impressions, if we had not advised or, having advised, were afraid to avow it, should we not merit the blasting mildew of public reproach which would inevitably fall upon us after the warring passions of the multitude against these prisoners shall have abated. We have advised our clients to insist on every legal advantage in defence of their lives, and here openly avow it, fearless of consequences. Our object is to save them from punishment, if not legally obnoxious to it, whatever may be their moral guilt; and this cannot be censured in counsel but by those whose unhallowed thirst for blood must be slaked in spite of the constitution and the laws of their country.

[David Hoffman, Esq.—I shall solicit your honour's indulgence while I briefly state our views as to the operation of the course adopted by the prisoners—viz. their standing mute. The indictment in these cases is predicated on the 19th section of the act of congress of 1810 [2 Stat. 598]. This provides that if any person shall rob any carrier of, or other person entrusted with, the mail of the United States, of such mail, or a part thereof, such offender shall be imprisoned, not exceeding ten years; and if in effecting such robbery he shall wound the person having custody of the mail, or put his life in jeopardy, by the use of dangerous weapons, such offender shall suffer death. The robbery of the mail, whether by mere putting in fear, wounding, or placing life in jeopardy, is an offence against the United States, originating in this act of congress. Its legal criminality, as a specific crime or public wrong against the Union, is derived solely from this source. In this act we find no provision whatever on the subject of standing mute, nor do we find that any other act of congress has legislated on the subject, except the act relative to crimes and punishments of 1790 (section 30), which surely can in no way apply or be extended to the present case, since that act provides for the case of standing mute only on indictments for crimes enumerated in that act. The present must therefore be a clear casus omissus; for the act of 1790 enumerates a variety of public wrongs, such as treason, piracy, perjury, bribery, forgery, falsifying of records, &c., &c., and constitutes these crimes against the United States. It then provides, that if "any person or persons be indicted of any of the offences herein set forth, for which the punishment is declared to be death, if he or they shall stand mute or will not answer to the indictment, or challenge peremptorily above the number of twenty persons of the jury; the court in any of the cases aforesaid shall, notwithstanding, proceed to the trial, as if he or they had pleaded not guilty, and render judgment thereon accordingly." Mail robbery, it is to be observed, is not one of the crimes enumerated in this act, but is an offence created by statute twenty years after. The power of the court to proceed to trial, on the prisoner's standing mute is given by no other statute than the act of 1790, and this, as we have seen, only where the prisoner is indicted for a crime enumerated in that act. As this is not there to be found, but originates in a law long subsequent, the legal sequitor to us appears to be that the present is a case at common law, wholly unaffected by the act of 1790.

[The provision relative to standing mute, contained in the 30th section of the law of 1790, surely will not be extended to the offence made a crime by the act of 1810; inasmuch as it is a principle of law, that a statute which takes away a common law remedy or privilege ought never to have an equitable construction. 10 Mod. 282. And it is laid down that if the words of a statute do not extend to a mischief which rarely happens, they shall not be extended by an equitable construction, to that mischief, but the case shall be considered as a casus omissus. Vaughan. 373. As, therefore, the act of 1810, on which the indictment is founded, contains no provision for the case of standing mute, and as the common law operation of standing mute appears to have been recognized by congress, and as the act of 1790 is the only statute speaking on the subject, and this extends expressly to the offences therein specified, and as its provision ought not to be extended by equitable construction, it appears to me a sound and legitimate conclusion that the present, as I have just stated, is a case of standing mute at common law, and

as such is to be dealt with differently from the case of an indictment for treason, piracy, &c. What then is to be the proceeding of this court, if the view I have just taken, and I hope with great deference, be correct? The books on this subject say that if a prisoner on his arraignment stand mute, the court ex officio must ascertain, by a jury, whether this proceed ex visitatione Dei, or ex malitia. On the verdict of this jury a judgment of mute is to be entered: and if it be decided that the muteness be from the visitation of God, the court shall ·proceed to the trial as if he had pleaded not guilty. This power, it will be perceived, is only in case the muteness be ex visitatione Dei. Vide 2 Hale, P. C. 317; 15 Vin. Abr. 532. And on this judgment, the better opinion appears to be that no sentence of death can be given. 2 Hale, P. C. 317; 4 Bl. Comm. 324. If the decision be that the prisoner is mute ex malitia, that is, obstinately, and he stands indicted for a felony, he can neither be tried nor convicted. He cannot be tried, because there is no issue, for there can be no issue without a plea, and, as we shall presently see, the judgment of peine forte et dure was introduced to extort a plea. Nor can such a prisoner be convicted, because standing mute amounts to conviction only in felonies of the highest and lowest degree, viz. in treason and petit larceny; so that quacunque via data, we cannot perceive how the prisoners in the present case can receive sentence of death; since the muteness, if supernatural, cannot be followed up by a judgment of death, and if from obstinacy, it is equally so, as there can be neither verdict nor conviction. 4 Bl. Comm. 325.

[It may be proper here to note an error of the learned district attorney, who in his observations just addressed to the court states it to be undoubted law, that standing mute in all cases, from the highest to the lowest crimes, amounts to conviction, and that the courts of England, for centuries past, have considered it so. The law I apprehend is not so. Standing mute amounts to conviction only in the highest and lowest crimes, viz. treason and petit larceny; and not as the gentleman has asserted, from the highest to the lowest. Prior to the statute 12 Geo. III. a. 20, (which can have no operation in this court, and therefore is to be wholly disregarded,) standing mute on indictments for any felony, other than treason and petit larceny, was uniformly followed, not by conviction, but by the judgment of penance. The books are so explicit on this point as to render misapprehension scarcely possible. Disingenuousness in stating the law is at all times censurable; but in a state officer, prosecuting in a case affecting the most dear and most valuable possession we have, —life,—it is surely doubly reprehensible.

[The crime, then, for which these prisoners stand indicted, being neither treason nor petit larceny, nor a crime affected by the 30th section of the act of 1790, which authorizes the court to proceed to trial in certain cases of standing mute, the present must be a case in which, in England, prior to the statute 12 Geo. III., the court would have proceeded to the sentence of penance, or peine forte et dure. Admitting, then, that had this case occurred in the court of king's bench, prior to the statute 12 Geo. III., the court would have awarded penance as the only means within their control, and conceding, gratia argumenti, this court to possess the power of awarding this terrible judgment, is the court now in a situation to pronounce such a judgment? Has there been that preliminary procedure, which forms the legal foundation for such a judgment? Has there been a jury impannelled to pronounce whether this muteness were obstinate, or by visitation of God? Has there been a judgment of mute? Farther, the books say that a mute prisoner is entitled to a respite for reflection. The sentence of penance is to be solemnly read to him, that he may be fully apprised of his danger. He is then to receive the trina admonitio. 15 Vin. Abr. 532; Staunf. P. C. 149. None of these formalities have taken place, so that if the court possess the power to award penance, as would unquestionably have been the only power of the court of king's bench, anterior to the 12 Geo. III., the exertions of this power should have preceded the forms just stated.

[Let us now briefly examine, whether this court can be considered as possessed of the power of awarding any such sentence. Such a power can be derived only from

[(1) The common law of England.
[(2) The statutes of England.
[(3) The acts of congress.
[(4) The acts of assembly of the state of Maryland.

[1. Admitting, for argument, this court in some cases to be guided by the English common law, the common law could give this court no such power, as the power itself in England is not derived from the common law, but from the statute of Westminster (3 Edw. I). Vide Bar. Obs. St. 32; 4 Bl. Comm. 327; Pref. to 1 State Tr. 12.

[2. There are no statutes of England, either prior to or since the Declaration of Independence, of any force or operation whatever, in any of the courts of the United States, so that we need not seek for this power in this source.

[3. It will not be pretended that any act of congress has legislated on the subject.

[4. Nor has any act of assembly of this state any provision whatever relative to this judgment of penance, and the statutes of Westminster (3 Edw. I.) has not been considered as extending to this state. Vide Kilty's Report of British Statutes.

[The case under consideration appears,

therefore, to be one in which the prisoner can be made responsible, if at all, only under the 3d count of this indictment, which is for an offence not capital. If these men be guilty of a crime which forfeits their lives, it may be a matter of regret that they cannot be amenable to the punishment so manifestly intended. But if the law be defective, let it be amended by the national legislature.

[The peine forte et dure was introduced in feudal times for the purpose of extorting a plea in capital cases, so that if death ensued, there might be a forfeiture or escheat of the prisoner's lands. But if there were no plea, corruption of blood, forfeiture, nor escheat could ensue.

[Finally, the prisoners in the present case stand mute. Can this court proceed to judgment as on a confession or conviction? We apprehend not, as standing mute is equivalent to conviction only in treason and petit larceny, and the statute 12 Geo. III., which renders standing mute in all cases a constructive confession, cannot alter the law of the case in this court. Can the court enter the plea of not guilty for the prisoners? We presume not, for even criminals have their rights, they cannot be forced to plead. Can this court proceed to trial as if the prisoners had pleaded not guilty? We humbly conceive not, as such a power is no where given but in the act of 1790, and there only in the cases of crimes therein specified.

[If the views I have thus briefly, hastily, and even to myself, unexpectedly taken, be not wholly unsound, I earnestly and respectfully entreat the court to accord to it some consideration, and, in favour of life, not to proceed but with great caution and consideration.] [3]

Before DUVAL, Circuit Justice, and HOUSTON, District Judge.

PER CURIAM. The two first named when arraigned severally pleaded not guilty, the third pleaded not guilty, and also put in a plea to the jurisdiction of the court.

The attorney for the United States objected to the double plea put in by Alexander; but it being after the hour of adjournment, the court adjourned till the next day, when the prisoners again being severally arraigned, Mr. Mitchell, one of their counsel, asked leave to withdraw their pleas, intimating that he did not then know what to advise his clients to plead. In order to give the accused full opportunity to make their defense, the court granted leave accordingly, under the impression that their counsel meant to plead other pleas. The accused being severally called on to answer were advised by their counsel to stand mute, and thus did stand mute, thus refusing to plead.

The attorney for the United States moved

the court to proceed to the trial in the same manner as if the accused had pleaded not guilty, according to the twenty-ninth section of the act for the punishment of certain crimes against the United States. To this the counsel for the prisoners objected, contending that this mode of proceeding was applicable only to the trial of the crimes specified in the act for the punishment of certain crimes against the United States, and could not be extended by construction to the crime of robbing the mail, made capital by an act of congress subsequently passed.

On the part of the prosecution it was argued that by the act to establish the judicial courts of the United States, full power and authority are given to the circuit courts of the United States to try all crimes and offenses cognizable under the authority of the United States, and that the manner of conducting the trial prescribed by the twenty-ninth section of the act, for the punishment of certain crimes, is applicable to all cases arising under laws subsequently passed, inflicting the punishment of death for the commission of any crime or offense. That standing mute by a criminal accused of a capital offense amounts to a constructive confession of guilt. That the privileges of a person accused of a capital offense by the twentieth section of the same act are general, and extend to the trial of all crimes made capital, whether specified in that act or not, and that the mode of trial must be the same. That by the thirty-fourth section of the act to establish the judicial courts of the United States, which provides that the laws of the several states, except when the constitution, treaties, or statutes of the United States shall otherwise provide, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases when they apply; the laws of the state of Maryland, and the practice of the courts under them, would justify the court in pronouncing the prisoner guilty on his standing mute.

The question presented to the court is a novel one in the courts of the United States, but it is a question in the decision of which they cannot doubt the power and authority of the court to proceed to the trial of the accused. By the constitution of the United States it is declared that the trial of all crimes, except in cases of impeachment, shall be by jury. The act aforementioned, to establish the judicial courts of the United States, gives to the circuit court exclusive cognizance of all crimes and offenses cognizable under the authority of the United States, except when a different provision could be made. The act regulating the post-office establishment by the thirty-fifth section grants authority to the judicial courts of the several states, under certain restrictions, to try all causes of action arising under, and all offenses against that act; but this grant of power is permissive, and does

[3] [From 2 Wheeler, Cr. Cas. 283.]

not impair the authority of the courts of the United States to try certain causes under that act. Without this grant of power to the courts of the states the jurisdiction of the courts of the United States would have been exclusive; with it their jurisdiction is concurrent. By the constitution a fair and impartial trial by jury in all criminal prosetions is secured to every citizen of the United States. After all these solemn and salutary regulations, it would be strange indeed if the accused could by any management evade a trial by jury. The courts of the United States have not common-law jurisdiction in criminal cases. They will not punish an offense at common law unless made punishable by statute. But they will resort to the common law for a construction of common-law phrases. Standing mute according to the ancient common law of England, from whence we have derived most of our institutions, was, in many cases, tantamount to a confession of guilt. And now, by statutes passed at different times, standing mute in all cases amounts to a constructive confession, and is equivalent to conviction. Robbery is felony by the common law. It is made felony by the laws of the United States, and punishable with death whether committed on land or water. Robbery of the mail, if committed with the use of weapons which jeopard the life of the carrier, is felony, and punishable with death. How is the criminal to be tried? Let the constitution and laws of the United States furnish the answer—by jury. This mode of trial is secured by the constitution to the accused in all criminal prosecutions; and the laws of the United States give full power and authority to the courts of the United States to try all offenders, and the trial is imperatively directed to be by jury. Yet the counsel for the prisoners contend that by standing mute the criminal can evade a trial altogether. As well might they contend that if the plea to the jurisdiction had not been withdrawn, and the court had passed their judgment of respondeat ouster, and the accused had refused to answer, there would have been an end of the trial, standing mute and refusing to answer being substantially the same. The penance or peine forte et dure, to compel an answer, is unknown to the laws of the United States. The act for the punishment of certain crimes directs that if any person indicted of any of the offenses, other than treason, set forth in the act, for which the punishment is declared to be death, shall stand mute, or will not answer to the indictment, or challenge peremptorily above the number of twenty persons of the jury, the court shall, notwithstanding, proceed to the trial as if he had plead not guilty, and render judgment accordingly. The act for regulating the postoffice establishment inflicts the punishment of death on persons who may rob the mail, if attended with the aggravated circumstance before mentioned. The

nineteenth section declares that on conviction the person committing such robbery shall suffer death. But how is he to be convicted? On trial by jury, conducted in the manner provided by law. The act for the punishment of certain crimes directs the manner, and if the person arraigned shall stand mute, or will not answer the indictment, or challenge peremptorily above the number of twenty persons of the jury, the court shall, notwithstanding, proceed to the trial as if he had pleaded not guilty. It is admitted that penal statutes should be construed strictly; that is, they shall be construed according to the strict letter in favor of the person accused, if there be any ambiguity in the language of the statute. But who ever heard of a construction that would prevent a trial altogether until the present time? Such a construction is calculated not only to defeat the purposes of justice, but to prostrate the constitution and laws of the Union.

Several acts of congress supplementary to the act to punish certain crimes have been passed at different times, inflicting heavy penalties for breaches of the law; and an act passed on the March 3d, 1817 [3 Stat. 383], prescribes the punishment of death for all offenses committed within the Indian boundaries, which before that time was punishable with death, if committed in any other part of the United States. In order to a just construction, it is proper to consider the whole system of criminal jurisprudence as established by the United States in our view. All the laws should be taken in pari materia. The objection will then be removed, and the court may proceed on the trial.

If the laws of Maryland are to be regarded as the rule of decision, the result will be the same. The declaration of rights adopts the common law of England, and the trial by jury according to the course of that law; and also all the English statutes existing at the time of their first emigration, and which by experience had been found applicable to their local and other circumstances, and such others as had been since made in England or Great Britain, and had been introduced, used and practiced by the courts of law or equity. As early as the year 1668 there are two cases on record in which criminals standing mute were sentenced by the court to be hanged. In the first case the crime was murder; in the second petit treason. By the act of 1737, c. 2, and 1744, c. 20, breaking open a tobacco house or other outhouse, and stealing goods and chattels to the value of five shillings sterling, and horse stealing are made felony and punishable with death; and if the accused shall stand mute, etc., the court may pronounce sentence against him. By the act of 1777, c. 20, if a person indicted for high treason shall stand mute, etc., the court may pronounce sentence of death against him, and all his estate is forfeited. The chancellor of the state in his report, in

pursuance of the direction of the legislature, of English statutes adopted and made applicable to Maryland, includes the statute of 12 Geo. III. c. 20. by which standing mute, in all cases of felony·and piracy, is equivalent to conviction.

No new offense is created by the act of congress regulating the postoffice establishment. Robbing is the generic term, and robbing is felony at the common law, and punishable as such. The state of Maryland, by an act passed in the year 1809, has adopted in substance, and almost in words, the provisions of the twenty-ninth section of the act of congress to punish certain crimes. It is provided by that act that in all cases of treason or felony, if the person accused shall stand mute, or will not answer to the indictment, the court shall proceed to the trial as if he had pleaded not guilty, and give judgment accordingly. Hence it appears that if the laws of the United States have not provided for the case, and the laws of Maryland are to be regarded as the rule of decision, standing mute, prior to the year 1809, would be equivalent to conviction. Subsequent to that period, the trial would proceed as if the accused had pleaded not guilty.

The court orders that the trial proceed by jury, as if the prisoner had pleaded not guilty.

⁴ [Mr. Kell [after the witnesses had been examined, and the evidence closed] then read the 19th section of the post-office law. (Act April 30, 1810, § 19): "That if any person shall rob any carrier of the mail of the United States, or other person entrusted therewith, of such mail, or of part thereof, such offender or offenders shall, on conviction, be imprisoned not exceeding ten years; and if convicted a second time of a like offence, he or they shall suffer death; or if in effecting such robbery of the mail the first time, the offender shall wound the person having custody thereof, or put his life in jeopardy, by the use of dangerous weapons, such offender or offenders shall suffer death." He then proceeded to inquire what is the putting life in jeopardy by the use of dangerous weapons?

[(1) The weapons used.

[(2) The manner of using them.

[(3) The alarm of the carrier.

[It appears, said Mr. Kell, all necessary to constitute the offence is proven. The party meet the driver in the night, on the highway, proclaim themselves highway robbers; that they are armed with double barrelled pistols and a dirk: that the pistols are cocked. It was then ascertained that they were armed with pistols which were presented towards the driver and passenger; and soon after, that they had a dirk. The exhibition of such weapons, the purpose for which such exhibition was made, does create danger and risk

⁴ [From 2 Wheeler. Cr. Cas. 283.]

of life; in other words, it does jeopardize life. It certainly was a putting the life of the driver, (as well as of Mr. Ludlow,) in jeopardy. Did it not diminish their personal safety, and expose them to hazard? It perhaps is not necessary that the driver should have apprehended his life to be in danger. If it were so, the language and requisites of the law are fully proven; he stood in the predicament of a man whose life was in danger, and under the fear and apprehension of danger, he parted with the mail. The prayer presents the case in the fairest and most favourable manner for the accused. The weapons used are such as are eminently calculated to endanger life, or put it in jeopardy; the pistols were cocked and presented, with the declaration, "If you resist, we will blow your brains out." This, 'tis true. the driver says he did not hear, but he heard and saw enough to produce fear, and therefore gave up the mail: can it be thought by any deliberate mind that such acts, for such a purpose, do not endanger life, or put it in jeopardy? Can it be said that the life of a man situated as was that of the carrier of the mail, at the time of this transaction, was not in danger? It is not necessary that the pistol be discharged; intimidation and danger, by such means, are sufficient to constitute the offence; the jeopardy of life takes place at the moment when the weapons are presented.

[With this view and consideration of the subject. Mr. Kell felt himself authorized to ask the opinion and direction of the court, contained in the prayer submitted to them.

[Gen. H. M. Winder hoped the court would not deem it irregular or improper for him, after what had occurred, to suggest his views to the court as amicus curiæ on the question now propounded by the counsel for the United States. Indeed, having been called upon by the prisoner, although at too late a period to be prepared to advise him preparatory to or in the conduct of the trial, yet he had deemed it his duty to listen attentively. and he thought, if anything occurred to his mind of real importance to the prisoner, he was bound in duty, both to the court and the prisoner, to state it. He had never seen the clause of the act of congress until the trial commenced, and received from that perusal a very strong impression that the evidence did not support those counts in the indictment which charges the prisoner with a capital offence. This impression had been strengthened by the little reflection he had been able to bestow upon it, and more strongly confirmed by what he had heard on the part of the United States. The words·of the act of congress are. "if in effecting such robbery," &c. See 2 Wheeler. Cr. Cas. 311.

[Now the life of the carrier must be put in actual jeopardy to bring the offence within that alternative of the clause; no apprehension of danger, or being put in fear of his life, satisfies the words of the act. The terms of

the prayer to the court are a fair and just statement of the extent to which the testimony in this case can be urged, and by the very terms of the prayer no jeopardy of life is even supposed. It simply states, that if the prisoner exhibited dangerous weapons calculated to take life, thereby putting the carrier in fear of his life, and thus obtaining, &c. Can it be supposed, for a moment, that this is what was meant by congress when they say, "put the life of the carrier in jeopardy"? It would be to attribute to congress the most loose and unskilful use of terms, to make the apprehension of danger the existence of danger, the fear of jeopardy actual jeopardy. It is wholly impossible to contend that the words do not import an actual jeopardy; and if they do, surely the assumed state of proof in this prayer does not amount to actual jeopardy.

[If the position contended for be true, it will follow that a man may be guilty under this part of the act where no jeopardy of life has occurred: and if the prayer exhibits the just interpretation of the act of congress, a robber may put the life of the carrier in actual jeopardy without being guilty; for if he raises a fear of life, by having dangerous weapons, without doing any act which could possibly put life in jeopardy, he is guilty; but if a robber, in the dark, without the carrier's knowledge, snaps a loaded pistol or gun within killing distance, with intent to kill the carrier, no body will doubt but here was actual jeopardy; but the carrier could not possibly have any fear of life, since he had no knowledge of it; and if the mail should be immediately stopped by the robber and his associates, without farther acts of intimidation, the party would not be guilty under this clause. Can it be imagined that a construction leading to such absurdity can be just?

[To support the construction contended for, it is necessary to confound fear of life with jeopardy of life. Now, since a man may be in great fear of his life, where there is not the least jeopardy of life, so there may be great jeopardy of life without the least fear of life. To say that congress, therefore, meant fear of life by jeopardy of life, is inadmissible, especially in a criminal statute. But farther, this jeopardy of life must, by the express terms of the act, be created by the use of dangerous weapons. What is the use of dangerous weapons which can occasion jeopardy of life? Certainly they must be so used, as that life may be destroyed; as if a man strike at another with a sword, or fire or snap a loaded pistol or gun at him within reaching distance; this is clearly a use of the weapon that puts life in jeopardy. But if a man has a sword by his side, or a pistol in his belt, and he stops the mail, and says to the carrier, "You see I am armed; deliver the mail," the carrier might justly be said to deliver the mail in such case for fear of life. But can it be said that in effecting this robbery the carrier's life was put in jeopardy by the use of dangerous weapons? It is impossible that it can.

[Then if there be no ambiguity in the words of the statute,—which it is respectfully believed there is not,—how can any interpretation, especially in such case as this, be admitted different from these words? The use of dangerous weapons to produce fear of life, may be very different from the use of dangerous weapons to put life in jeopardy; but nothing in this act can render a man guilty but such a use of these as puts life in jeopardy. The facts in this case ought, therefore, to warrant the counsel for the United States to ask the court to direct the jury that if they believe the prisoner had dangerous weapons, which he used so as to put the carrier's life in jeopardy, then he is guilty, otherwise the court cannot instruct the jury to find a verdict of guilty on this point.

[General Winder concluded by remarking to the court that this view of the subject appeared to his mind very strong, and he thought could not but have strong weight with every unprejudiced mind; and since upon so hasty a view of the question, such strong motives of doubt, to say the least, had occurred, he trusted the court would, in the forlorn case of the prisoner, being without counsel prepared to assist him, incline to the side of mildness; but at all events, if the learned attorney general should be able to incline the balance against the prisoner, he respectfully submitted, whether the question was not so doubtful as to require the court to put it in a situation to receive the deliberate judgment of the supreme court, before the life of the prisoner should be taken.

[E. L. Finley, Esq.—He contended that congress, in using the words, "jeopardy of life," did not intend that the mere presentation of a pistol or dirk at the mail driver, without wounding him, should be such a "jeopardy of life" as would subject the party to the punishment of death: that the words, "wound the driver, or put his life in jeopardy," were used by them as convertible and synonymous words; that the words "put his life in jeopardy," were intended as explanatory of the words "wounding the driver," and defining and limiting their extent. Congress (said Mr. Finley) intended that the wounding should be such as would put the life of the driver in jeopardy. They may have supposed that some doubts might arise upon the construction of the words wounding, and as to the nature and extent of the wounding. They, therefore, inserted the words "jeopardy of life," as explanatory, and to show that unless the wounding was of so serious a nature as to jeopardise life, the party should be subject only to imprisonment. The use of the disjunctive particle "or," does not necessarily make them two distinct offences. Mildness and humanity are the distinguishing characteristics of our Crimi-

nal Code. The number of offences to which the punishment of death is annexed is very limited: and it is only where the offence is of a very aggravated and criminal character, that this humane consideration for the lives of the citizens has been departed from. The act of 1810 [2 Stat. 592] was intended as an amelioration of the former post office act. The act of 1794 (section 17) annexed the penalty of death to a simple robbery of the mail, unaccompanied with injury to the driver, or the use of dangerous weapons. This severe punishment was considered as disproportioned to the offence. This act was repealed by that of 1810, which, in the first clause of the 19th section, provides, that for a simple robbery of the mail, the party guilty shall be subject to 10 years' imprisonment. Congress have determined, therefore, in this clause, by the punishment annexed, the degree of enormity they attached to a simple robbery of the mail. As then they did not consider it such an offence as to deserve death, they must be presumed to have intended, that unless the offence was attended with very aggravating circumstances, such as jeopardising the life of the driver by seriously wounding him, the punishment of death should not be superadded. This would be, in my opinion, an humane and reasonable construction of the act of congress. But if your honours should establish the construction contended for by counsel of the United States, viz. that wounding and jeopardising are two distinct offences, this act loses all its character of mildness, and would deserve to be enrolled in the bloody code of Draco. You could not undertake to graduate the degree of wounding. But if in effecting the robbery of the mail, the party should wound the driver slightly or seriously—no matter whether in consequence of such wound his life should be jeopardised or not—it would be perfectly immaterial, and you would be obliged to inflict upon the party robbing the punishment of death. To show, then, the absurdity of this construction, and its incompatibility with the object which congress must have had in view in making this provision of the act of 1810, viz. the amelioration of the act of 1794, punishing simple robbery with death. Suppose that in effecting the robbery of the mail, the robber should make a slight and trifling puncture with his dirk in the flesh of the driver; should scratch the face or cut the skin of the driver, or some other slight wound, which could not, by any possibility of construction or inference, jeopardise his life. Would this be a circumstance of such aggravation of such enormity, as to entirely change the character or degree of the offence of simple robbery, to enhance its criminality, and to give to it such an increased and outrageous degree of wickedness, as to require the proportionably severe punishment of death? Is it equal in criminality, and does it call for the same degree of punishment? Would this

be an amelioration of the act of 1794? Heaven protect us from such an amelioration! But if the construction contended for by the counsel of the United States be correct, the slightest scratch or puncture given to the driver, or the mere presentation of a pistol or dirk, without wounding him, changes the mild character of the law, and subjects the party to death. Where was, then, the necessity of repealing the 17th section of the act of 1794, and substituting the 19th section of 1810? The act of 1794 makes no mention of dangerous weapons; it simply speaks of the robbery of the mail, and whether the robbery was effected by the use of weapons or not, the punishment was death. But is it to be presumed that a highway robbery of the mail would ever be attempted without dangerous weapons, such as pistols and dirks? If the mere presentation, then, of dangerous weapons, without wounding, attaches death to the offence, the first clause of the 19th section of 1810, punishing a simple robbery, would be entirely nugatory and superfluous; as no robbery ever has, or ever would be committed without dangerous weapons. Can we suppose, then, that congress had no object in view in making this provision and drawing a distinction between a simple robbery, and one accompanied with wounding?

[Mr. Finley then observed that he had always understood it to be an established principle, in all our courts of criminal judicature, and one from which courts or juries could not deviate, that the most favourable, the most refined, the most extended construction, should always be given, in "favorem vitae," to all penal acts. That too much value and consideration were attached to the life of a fellow creature, to permit it to be "jeopardised," or taken away on account of indistinctness or ambiguity in the phraseology of a law. That when the provisions of a law appeared to be unusually harsh and severe, and repugnant to the general character and habits of the people and a construction in "favorem vitae," could be collected from the probable intention of the legislature that enacted it, that then such intention was to be the rule of construction. That the law of 1810, in the severity of its provisions, as contended for, was an anomaly in our Criminal Code; an isolated bloody statute, assimilating with nothing around it. That the most effectual mode of ascertaining the intention of congress, at the time of passing the law, and truly determining the construction they intended should be given to it, would be by examining the operation of the law, and comparing it with the policy which congress must have had in view in repealing the law of 1794, and substituting that of 1810.

[Mr. Finley then took a view of the laws of England and France on the subject of robberies, of the respective policy of those laws, and their effect upon those two nations,

[In France, said Mr. Finley, a robbery unattended with murder of the person robbed is punished, by fine and imprisonment; if accompanied with murder, the punishment is an ignominious and painful death. In England, a simple robbery, whether accompanied by murder or not, is punished with death.

[What has been the effect and operation of these several laws? In France, all temptation to murder the person robbed is taken away; the fear and the interest, if not the humanity, of the robber, are enlisted and appealed to. The law says to him: "If the robbery you commit is unattended by murder, if it is not aggravated by taking away the life of a fellow creature, we will reward you for your forbearance by respecting your own life. But if it is attended with the horrid and unnecessary crime of murder of your victim, the severest punishment which the law can inflict, viz. the deprivation of life, shall be the consequence of your cruelty." In England, no distinction of punishment is made between robbery with and without murder; and the highwayman, who, probably impelled by the severest want, takes from you your purse, without endangering your life or even using any personal violence, and the hackneyed and hardened villain, who, to pamper and gratify his profligate passions, not only robs you of your purse, but deliberately and unnecessarily takes away your life, are alike involved in the same punishment, and punished in the same degree, notwithstanding the great disparity in the two crimes. All inducement to spare the life is therefore taken away for want of this discrimination. The highwayman, in the first instance, knows, that if he spares life, he leaves a witness to proclaim his crime, and to rise up in judgment against him when detected; that the law will not mitigate the severity of its punishment on account of his forbearance; but that if he murders his victim, he saves his own life, by silencing the only witness that could appear against him at a human tribunal. The consequence of this discriminating policy of the French law is that scarcely an instance occurs of the perpetration of a robbery, accompanied with murder; whilst the lamentable result of the mistaken and barbarous policy of the English law is that murder is almost inseparable from, and concomitant with, high robbery; and the criminal annals of England, furnish a bloody calendar from one year to another. May not congress then have had these several results of European policy in view at the time of passing this law? Would they not profit by experience? The object of their legislation was the public good, and the reformation of criminals But it would be charging them with a most culpable disregard of the lives and safety of their fellow citizens to suppose that they would be uninfluenced by the consideration of those several results. A reference, however, to the actual operation of the act of 1794, furnishes an additional and conclusive corroboration of the construction I contend for, and of the intention of congress to ameliorate the act of 1794 by that of 1810; for during the existence of the first act, several attempts at a robbery of the mail were made, and in almost every instance it was attended either with the murder of the driver, or the dangerously wounding of him.

[In the instance of the robbery of the Richmond mail, the driver was murdered.

[Mr. Finley then observed that the construction he had contended for, he conscientiously believed to be the true and correct one; but that, as he might be unsuccessful in his attempt to transfer this conviction from his own mind to the minds of the court, and as the counsel for the United States had contended for a different construction, he would make a brief reply to one of the arguments of the counsel, and then relieve the attention of the court The counsel for the United States, said Mr. Finley, have contended, that the mere apprehension or opinion of the party that his life was in danger was to be the criterion by which the jury was to determine whether his life was put in jeopardy, within the meaning of the act of congress. This, I conceive, to be a most absurd and fallacious criterion. It would require a scale in every instance by which to graduate the fears of the party robbed. Some persons are operated upon by fear more easily than others. Such is the constitutional timidity of some persons, as to magnify mole hills into mountains, and to people every bush with midnight assassins and robbers. Should the driver be of this description, his life would be in continual jeopardy, according to this construction, while travelling on his route. The counsel have not properly discriminated between the mere fear or apprehension of danger, and the actual existence of danger. A man may anticipate danger, when no danger exists. I will give but one example in illustration of this distinction. Suppose a man presents a pistol, which is not loaded, at the breast of another (who is ignorant of its not being loaded), and in a threatening manner says that he will blow his brains out. In this case, the party to whose breast the pistol is presented would most assuredly apprehend that his life was in great jeopardy, though the jeopardy would exist only in imagination.

[Mr. Finley, then laid down a distinction between the jeopardy of the driver's life and the life of Mr. Ludlow. He contended that under this act it was perfectly immaterial whether Mr. Ludlow's life was jeopardised or not. That the act only extended to the driver's life, and expressly confined and annexed the punishment of death to cases of robbery, when the driver was wounded, or his life put in jeopardy. That

this was an important distinction to be kept in view by the jury, in the examination of and decision upon the testimony in this case. That there was a manifest difference in the testimony of Mr. Ludlow, and of the driver. That, although Mr. Ludlow swore that he considered his life in great danger, yet the driver swore that he felt no apprehension of danger to his life, until after the robbery was effected, and that this apprehension arose from an observation by one of the robbers, "What shall we do with these men?" and the reply, "I have a way to fix them;" but that his fears were removed, when he found, that "the way to fix them" was by tying them to the tail of the mail wagon. That he did not intend, by adverting to this difference in their testimony, to impeach the credit either of Mr. Ludlow or the driver; but to show that whatever may have been the apprehensions of Mr. Ludlow, or however his life may have been jeopardised, yet, that the driver's life was not jeopardised; neither did he feel any apprehensions of it.

[William Wirt, Esq.—He hoped the opposite counsel would both excuse him for observing that they did not appear to him to have found the key which unlocked the construction of this law in a manner the most simple and natural. They seemed to have taken it for granted that congress intended to describe, by this section, a new kind of robbery, unknown to the common law, and which called for a different kind of proof. From this opinion he begged leave to dissent. He contended that congress had not intended to create a new offence, unknown to the common law, so far as the circumstances attending the act and the degree of proof were concerned. That although the mail was a species of property unknown to the common law, and congress, in making the mail a subject of robbery, had extended the offence to a new subject; yet that the character of the offence, the robbery, was the same, both at common law and under this statute: that the only effect of the act was to extend the offence to a new subject, leaving the character of the offence, and the degree of proof, exactly where the common law had left them, in regard to other subjects. To make this clear, he begged the court to recollect that wherever the constitution or laws of the United States used a common law phrase, without any definition of that phrase, it was the uniform course to resort to the common law for its explanation. It was unnecessary to cite to this court, to whom they were familiar, the decisions which illustrated and proved this course; it was, indeed, impossible to conceive that any other could be adopted. But the court would observe that this principle was essential to the construction of this law, and that it demonstrated the truth that a new kind of robbery was not intended to be created. For in the first part of this section the term "robbery" is

used without any definition. The words are (Act April 30, 1810, § 19): "That if any person shall rob any carrier of the mail of the United States, or other person entrusted therewith, of such mail, or of part thereof, such offender or offenders shall, on conviction, be imprisoned not exceeding ten years; and if convicted a second time of a like offence, he or they shall suffer death; or if in effecting such robbery of the mail the first time, the offender shall wound the person having custody thereof, or put his life in jeopardy by the use of dangerous weapons, such offender or offenders shall suffer death." Thus far the provision is general, by the use of the term "robbery," which is left unexplained. A resort must, therefore, be had to the common law, from which it is borrowed to explain it; and every species of robbery known to the common law is clearly embraced by the clause just quoted. If the court will attend to the structure of the sentences which follow this first sentence, and which are supposed to create a new offence, they are merely exceptions from the first sentence, and were consequently included in it, until so excepted. If the first sentence therefore covers, and merely covers, the common law offence of robbery, and the latter are only exceptions from it, these exceptions are merely parts of the common law offence of robbery, and consequently no new offence, and calling for no new and more aggravated degree of proof. Again, if you recall the different species of robbery as they have been decided to exist at the common law, you will perceive that the sentence on which the two first counts of the indictment are founded describes a kind of robbery perfectly familiar to the common law. At the common law, robbery might be committed: (1) By violence, without putting life in danger, and without previous fear. The lady whose ring was snatched from her in some place of public amusement, and dropped among the curls of her hair, was decided to have been robbed, although there was no danger of life, and no previous fear operating on her will to cause a surrender of the property. (2) By fear for reputation: as by a threat to charge the party with an infamous crime unless he should surrender his purse. In this case, there is no violence offered to the person and no danger to the life, yet the robbery is complete; it is the lawless constraint acting on his will, from regard to his character, which induces the surrender of his property, and which constitutes the offence. (3) By fear of personal violence: but this must not be the groundless fear of cowardice. The law requires that the danger should be apparent, and hence circumstances are always required to show that the fear was well founded. This was the kind of robbery in the contemplation of congress in the sentence under consideration. They have stated the evidence which shall show that the danger was real, the fear well grounded;

wounding the driver, or (without wounding him) putting his life in jeopardy, by the use of dangerous weapons. The robber, who, with a pistol, stops a traveller on the highway, and demands his purse (a case familiar to the common law courts of criminal jurisdiction in England,) presents the very case put by the act of congress. The weapon used is a pistol; a weapon fabricated for the very purpose of danger to life. It is used because it is dangerous; and the use produces the effect intended, by acting on the fears of the traveller, and inducing him to surrender his purse, by reason of the jeopardy to his life. There is nothing in the descriptive circumstances of the offence under the act of congress to distinguish that offence from the highway robberies once so common on Hounslow Heath and Bagshot in England.

[But it is insisted on the other side, said Mr. Wirt, that something more is meant by the expression "putting the life of the driver in jeopardy by the use of dangerous weapons." It is not enough that the robber be in possession of the dangerous weapons; it is not enough that he carry them to the ground; it is not enough that he perpetrates the robbery by the terror which they inspire: but they must be used in such a way as to produce jeopardy. For example, if the weapon be a dirk, a stroke must be made with it; if it be a pistol, it must at least be snapped. Let us examine some of the consequences of this construction. If a stroke be made with a dirk at right angles from the driver, it is not easy to conceive that greater jeopardy is produced thereby than by the mere possession and display of the weapon in the robber's hand. Such a stroke would be nothing more than a flourish, in terrorem. If the stroke be at an angle of forty-five or twenty-two and a half degrees, the same answer might be given to it; and so through all the gradations of angular distance. If the stroke miss the object, and be not repeated, the jeopardy is over, a miss, we are told, being as good as a mile. Or of gentlemen think this answer too light, is it not obvious that by insisting that the stroke shall, at all events, be made, in order to constitute jeopardy, they force the court and jury upon a mathematical disquisition as to the distance and the direction of the stroke, in order to jeopard the life? points extremely difficult of ascertainment, considering that their attempts are generally, if not always, made in the night time, when the distance and the direction, and even the fact of a stroke being made at all, can rarely be discerned. As to the snapping of the pistol, all the remarks made upon the direction of a stroke with a dirk apply; and indeed it is not very easy to discern, even if the pistol be levelled at the driver's head, how its having been snapped increased his jeopardy after the snap is over. Besides, the chances are sadly against the calculation that a pistol prepared for a robbery will snap; the probability is that it will

go off; and then there is no jeopardy, for jeopardy implies uncertain danger, whereas, on this supposition, the hazard is reduced to a doleful certainty; the driver is killed. Can it be believed that this was the intention of congress? Can it be believed that anything more was meant than that the robbery should be effected by the use of dangerous weapons, of weapons calculated to take life?

[But still bolder ground is assumed on the other side. It is contended that in this case there was no jeopardy to life, because the robbers gave the assurance that if the driver and passenger would not resist they should not be hurt. It may be very true, gentlemen say, that if they had resisted they would have been killed; but they had only to give up the mail without resistance, and there was no jeopardy at all; and hence the case is not within the act of congress. This is the construction given to an act of congress intended to prevent robberies. Sir, it must be very clear that the jeopardy within the contemplation of congress was that kind of jeopardy which was in no other way to be avoided than by yielding to the lawless purposes of the robber; a jeopardy of life so imminent that the driver could not elude it, except by surrendering that which the robber had no right to demand. This ground so intrepidly taken in the construction of our statute would be just as tenable under the English common law. For example, by that law it is required that the party shall be put in fear; but the courts there require that this fear shall have a reasonable foundation. The robber there might say, "It is true, I was armed; it is true the traveller was put in fear; but the case is not within the law, because his fear had not a reasonable foundation, for he admits I told him I would not hurt him if he would surrender his purse." Such an argument, I must be permitted to say, would make but a sorry figure in Westminster Hall, or even at Old Bailey, for it goes to patronize and protect, not to prevent or punish, robberies; it founds the robber's exemption from punishment on the very circumstance which constitutes his guilt—the success of the robbery.

[The gentleman who urged his argument attempted to support it by a case from the law touching assaults and batteries, which he seemed to think analogous. That case is this: "If a man were to lay his hand upon his sword, and say if it were not assize time he would not take such language; this the gentleman says, and says truly, would not be an assault. But why? For a reason which destroys the analogy, because the words show an absolute purpose to do him no mischief at that time. The forbearance is not put on the condition of any act to be done by the party menaced. But suppose the assailant had drawn his sword, and required the other to fall upon his knees instantaneously and beg his pardon, or he would run him through the body, when the gentleman shall show

by authority that this would not be an assault, he will have furnished a case which does not present something like the appearance of analogy."

[The respectable young gentleman (Mr. Finley) who last addressed the court has insisted that the words "wounding the driver" or "putting his life in jeopardy by the use of dangerous weapons" mean the same thing; that the driver is, at all events to be wounded, and so wounded as to put his life in jeopardy. To this I think it sufficient to answer that the conjunction used is the disjunctive "or," and that according to all the rules of fair construction there were two cases in the contemplation of congress,—the one wounding the driver, the other putting his life in jeopardy by the use of dangerous weapons without wounding him. The aid which the gentleman attempts to derive to this construction from the act of 1799 is not, in my opinion, fairly furnished. The expression in that law is, "shall much wound the person having custody thereof, or put his life in jeopardy by the use of dangerous weapons." These were clearly distinct offences. In the present law, the word "much" is dropped, obviously because it was indefinite, and might lead to difficulties in the decision of cases arising under it, and because any wounding of the driver would be sufficient to show the wicked and determined purpose of the robber; but that purpose would be shown with equal clearness without wounding the driver, in effecting the robbery by the use of dangerous weapons calculated to take the driver's life.

[If any doubt could remain on this subject, it would be removed by pursuing this section of the law a little farther. It appears that robbing the mail, generally, is punished by the first clause of the section only with imprisonment for the first offence. Yet there were some modes of perpetrating such robbery so peculiarly obnoxious that congress had singled them out by express exception, and punished the first offence committed in either of these modes with death. Congress have gone still farther, and punished even the unsuccessful attempt to commit the robbery in either of these modes with imprisonment for three years; and the words in the section, in which the attempt is described, are intended to represent the same mode in which the act is described. So far as we have yet gone, the purpose is to punish the offence, if effected. Congress next take up the attempt to commit the offence where it fails. In defining the different modes of such attempts, they have kept up the analogy between the successful and unsuccessful attempts, and by a slight variation of language have thrown new light on the clause we are considering. The language of the law, where the offence is complete, is as follows: "If any person shall rob any carrier of the mail of the United States, or other person entrusted therewith, of such mail, or of part

thereof, such offender or offenders shall, on conviction, be imprisoned not exceeding ten years; and if convicted a second time of a like offence, he or they shall suffer death; or if in effecting such robbery of the mail, the first time, the offender shall wound the person having custody thereof, or put his life in jeopardy by the use of dangerous weapons, such offender or offenders shall suffer death." I beg the court now to mark the correspondent description of the attempts. The words are these, "And if any person shall attempt to rob the mail of the United States by assaulting the person having custody thereof, shooting at him, or his horse or mule, or threatening him with dangerous weapons, and the robbery is not effected." &c. Here it is clearly observable that the assault, generally, meets the general description of the robbery, in the first sentence; secondly, that the shooting, in the attempt, corresponds with the wounding in the robbery; and thirdly, that the threatening the driver with dangerous weapons, in the unsuccessful attempt, corresponds with the putting his life in jeopardy by the use of dangerous weapons. Thus the description of the attempt reflects light on the description of the act, and demonstrates that congress, by using the terms "putting his life in jeopardy by use of dangerous weapons," meant nothing more than "threatening him with dangerous weapons," without having in view any other use of the weapons, or any further degree of jeopardy. According to the opposite construction, it would appear that congress had been solicitous to punish this peculiar mode of attempting the robbery with a peculiar punishment, distinguishing this kind of attempt from any other attempt; while the actual perpetrating the robbery by the use of dangerous weapons was left unpunished by any peculiar degree of rigor; thus convicting congress of an absurd solicitude about the attempt, without any correspondent solicitude in relation to the act; and to produce this absurd consequence, you are required to adopt principles of construction so subtile and metaphysical, as to what will not constitute jeopardy, that there are perhaps no twelve men in the community who will agree in their application to the same case. If you take the plain case which it seems to me was clearly before congress, that of robbing the mail upon the highway by the use of weapons dangerous to life, every case which can arise is carved, and the act is in perfect harmony with itself. By any other construction, the act is rendered imperfect, unjust, and absurd.] [5]

THE COURT charged the jury upon the laws as follows: "Robbing the carrier of the mail of the United States, or other person intrusted therewith, of such mail, by stopping him on the highway, demanding the surrender of the mail, and at the same time show-

---

[5] [From 2 Wheeler, Cr. Cas. 283.]

ing weapons calculated to take life, such as pistols or dirks, putting him in fear of his life, and obtaining possession of the mail by the means aforesaid, against the will of the carrier, is such a robbing of the mail, and such a putting the life of the carrier or person intrusted therewith in jeopardy by the use of dangerous weapons, as will bring the offense within the following terms of the nineteenth section of the act of congress of the 30th of April, 1810, entitled 'An act regulating the postoffice establishment,' to wit: 'Or if in effecting such robbery of the mail the first time the offender shall wound the person having the custody thereof, or put his life in jeopardy by the use of dangerous weapons, such offender or offenders shall suffer death.' "

The defendants were convicted and executed.

Standing mute is equivalent to a plea of not guilty. See U. S. v. Borger, 7 Fed. 195, affirming above case on this point.

[NOTE. On the trial of John Alexander and Lewis Hare, the two other mail robbers, who were charged with robbing the mail in company with John Thompson Hare, and were immediately tried and convicted on all the counts of a similar indictment, the same defence was made, and the court laid down the law as in the preceding case.] [6]

---

[6] [From 2 Wheeler, Cr. Cas. 283.]

